Filed 8/8/16  P. v. Adib CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C077338/C077149 |
| Plaintiff and Respondent, | (Super. Ct. Nos. CM040896/CM034671) |
| v. | |
| PARHAM ADIB, | |
| Defendant and Appellant. | |

Found guilty of possessing a controlled substance for sale, defendant Parham Adib appeals, challenging the sufficiency of the evidence, prosecutorial misconduct, the lack of a unanimity instruction, and the admission of what he claims was irrelevant evidence. Finding no merit in any of his arguments, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In May 2011, after being stopped by Chico police, defendant was found to have 16 bindles of a crystalline substance in his jacket pocket.  The substance turned out to be MDMA.  He was charged with and convicted of possessing a controlled substance for

purpose of sale. The trial court suspended imposition of sentence on that conviction and placed defendant on three years' probation. Defendant timely appealed.

DISCUSSION

I

*Sufficiency Of The Evidence*

Defendant contends the People "failed to present sufficient evidence that MDMA is an analog of MDA." We disagree.

"The Health and Safety Code lists the various substances it controls in five extensive schedules. (§§ 11054–11058.) The listings include 'official, common, usual, chemical, [and] trade name[s].' (§ 11053.) The code also regulates 'analogs' of listed controlled substances (analogs) . . . ." (*People v. Davis* (2013) 57 Cal.4th 353, 358.) "Section 11054 sets out Schedule I substances. It identifies '3,4–methylenedioxy amphetamine' (MDA) as a controlled substance. (§ 11054, subd. (d)(6).) It further defines as a controlled substance 'any material, compound, mixture, or preparation' containing 'any quantity' of any listed hallucinogenic substances, including MDA, or any 'salts, isomers, and salts of isomers' of such substances. (§ 11054, subd. (d).) [¶] In 1988, the Legislature added chapter 6.5 to the code to regulate analogs. (Stats. 1988, ch. 712, § 4, p. 2364.) It found that controlled substance laws were being circumvented by the use of analogs which 'have, are represented to have, or are intended to have effects on the central nervous system which are substantially similar to, or greater than, the controlled substances classified in Sections 11054 and 11055 . . . . These analogs present grave dangers to the health and safety of the people of this state. Therefore, it is the intent of the Legislature that a controlled substance analog . . . be considered identical, for purposes of the penalties and punishment . . . to the controlled substance in Section 11054 or 11055 of which it is an analog.' (§ 11400.) [¶] An analog is defined as a substance that: (1) has a substantially similar chemical structure as the controlled substance, or (2) has, is represented as having, or is intended to have a substantially

2

similar or greater stimulant, depressant, or hallucinogenic effect on the central nervous system as the controlled substance.  (§ 11401, subd. (b)(1) & (2).)"  (*Davis*, *supra*, 57 Cal.4th at p. 358.)

Based on the foregoing, as we will explain, the question here is whether the People presented sufficient evidence that MDMA has a substantially similar chemical structure as MDA.  We conclude they did.

Where, as here, a defendant challenges the sufficiency of the evidence to support his conviction, "[t]he standard of review is well settled:  On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence that is reasonable, credible and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  ' "[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." ' "  (*People v. Snow* (2003) 30 Cal.4th 43, 66.) "Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact]."  (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.)

Here, the People offered the expert testimony of Edmond Combatalade -- a forensic toxicologist and criminalist with Valley Toxicology Services -- regarding the similarity between the chemical structures of MDMA and MDA.  Combatalade has a bachelor of science degree in chemistry from U.C. Davis.  He drew a diagram for the jury of an MDMA molecule, then drew a diagram of an MDA molecule.  Comparing the two diagrams, Combatalade testified that both molecules have a six carbon structure that has two dioxenes (a dioxy is two oxygen atoms) on the far left.  When asked if there were other similarities between the two molecules, Combatalade testified that everything was the same except that in MDMA, the nitrogen atom is connected to "hydrogen and

3

methedrine," while in MDA the nitrogen atom is connected to "just two hydrogens." Stated another way, MDA does not have a "methyl group." In Combatalade's opinion, MDMA and MDA have a substantially similar structure, making them analogs, because of "the differences of only one methyl group."

On cross-examination, defense counsel elicited Combatalade's testimony that a water molecule (an oxygen atom bonded to two hydrogen atoms) differs from a methanol (methyl alcohol) molecule in the same manner that MDA differs from MDMA -- because of the substitution of a methyl group for one of the hydrogen atoms. Combatalade expressed his opinion that the substitution of a methyl group for one of the hydrogen atoms in a water molecule makes water *not* substantially similar to methanol and thus the change of a methyl group for a hydrogen atom *can* substantially affect the chemical structure of a substance. He explained, however, that the substitution of a methyl group for a hydrogen atom can substantially affect a chemical structure "*[d]epending on the size of the chemical structure*," (italics added) and water and methanol are, in their chemical structures, "much, much smaller than . . . MDA or MDMA." Because of the size of a water molecule -- three atoms -- that substitution constitutes "a very large change," because "you exchange one atom for another four," "[w]hereas if you deal with a much larger molecule, the change is much smaller." Combatalade drew a comparison between adding the number one to the number one and adding the number one to the number 100: "The difference between 1 and 2 is twice as much; between 100 and 101, it's not twice as much." Defense counsel then asked, "But isn't it true that a change in even a larger molecule can substantially alter the characteristics of the substance or even change the substance into something else altogether" to which Combatalade responded, "I don't know."

On redirect, Combatalade testified there are 29 atoms in MDMA and 26 atoms in MDA.

4

Combatalade's expert testimony constitutes substantial evidence that MDMA and MDA have substantially similar chemical structures such that MDMA qualifies as an analog of MDA. On appeal, the crux of defendant's argument to the contrary is that because Combatalade "admitted that he did not know whether a change in a larger molecule could substantially alter the characteristics of a substance into something else, altogether," he essentially admitted that he "did not know whether the additional methyl group could change a larger chemical (such as MDMA, or MDA) [into something else and thus] his opinion that [the addition of the methyl group] did not create a significant change in this case amounted to speculation."

We find no merit in that argument. Combatalade persuasively explained that despite the substitution of a four-atom methyl group for a singular hydrogen atom, which is what differentiates MDMA from MDA, in his opinion the chemical structures of the two substances are substantially similar because the remaining 25 atoms the two molecules have in common are identical. His testimony that he did not know whether, in general, "a change in even a larger molecule can substantially alter the characteristics of the substance or even change the substance into something else altogether" does not turn Combatalade's opinion about the substantial similarity between the chemical structures of MDMA and MDA into speculation or undercut it in any way. Accordingly, defendant's challenge to the sufficiency of the evidence is without merit.

II

*Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct by quantifying the reasonable doubt standard. Again, we disagree. Moreover, we find defendant forfeited his argument that the trial court should have done more than reread the pattern instruction to the jury following the prosecutor's comment because defense counsel expressly acquiesced to that course of action.

5

The trial court instructed the jury with the pattern instruction on reasonable doubt, CALCRIM No. 220. This included telling the jury that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt."

In closing argument, defense counsel compared the reasonable doubt standard of proof to other standards -- specifically, probable cause, preponderance of the evidence, and clear and convincing evidence -- and suggested that if the People had met only those lesser standards, the jury should find defendant not guilty.

In rebuttal, the prosecutor told the jury, "[t]here is absolutely no law before you or analysis on [the lesser burdens of proof]. So [it] probably wouldn't be a good idea to refer back to things that you don't have an explanation of. [¶] Focus on things you do have an explanation of: Beyond a reasonable doubt. As you know, it's not beyond all possible doubt; okay? So don't hold me to a higher standard; it's not a hundred percent."

At that point, defense counsel objected, asserting that the prosecutor was "misstating the law." The court told the jurors that "if either counsel misstates the evidence or the law, rely on the evidence that was presented in the trial and the law that was -- that is presented to you by me." At a sidebar conference immediately thereafter, defense counsel asserted that it was "improper for Counsel to try this at a percentage standard of proof" and asked that the court "instruct the jury that they cannot consider this on a percentage basis." The court asked defense counsel, "Would you agree that a hundred percent is beyond any doubt whatsoever?" Rather than answer the question, counsel asserted his belief that "referring to any percentage basis is improper." When the court asked defense counsel what he wanted the court to do, counsel responded, "I'm asking the Court to instruct the jury that they must determine whether, whether the case is beyond a, beyond a reasonable doubt" and that "applying a percentage standard would be

6

improper." The court told counsel, "[w]hat I intend to do is reread [CALCRIM No.] 220. Is that going to be sufficient?" Defense counsel replied, "Yes."

On appeal, defendant contends "[t]he prosecutor committed misconduct by suggesting to the jury that it could quantify the reasonable doubt standard as a percentage." The People contend defendant forfeited this argument because he "failed to object on the ground of prosecutorial misconduct and failed to request a jury admonition." The People further argue that "the prosecutor's comments were not inappropriate," and even if they were, "there is absolutely no indication that the prosecutor's statement rendered the trial fundamentally unfair."

Case law has held that suggesting "a quantitative measure of reasonable doubt" in a manner that "convey[s] an impression of a lesser standard of proof than the constitutionally required standard of proof beyond a reasonable doubt" constitutes misconduct. (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1268.) In *Katzenberger*, the prosecutor used a slide show of an eight-piece puzzle of the Statue of Liberty in explaining the reasonable doubt standard to the jury. "When the sixth puzzle piece of the slide show was in place, leaving two missing pieces, the prosecutor told the jury, 'this picture is beyond a reasonable doubt' . . . ." (*Id.* at pp. 1267-1268.) The appellate court concluded that, by doing so, the prosecutor committed misconduct by "inappropriately suggesting a specific quantitative measure of reasonable doubt, i.e., 75 percent." (*Id.* at p. 1268.)

The argument in this case is distinguishable from that in *Katzenberger* because here the prosecutor did not suggest to the jury that any particular percentage less than 100 was equivalent to "beyond a reasonable doubt." Instead, the prosecutor merely informed the jury that "beyond a reasonable doubt" was not "a hundred percent" conviction. This was the equivalent of the statement in CALCRIM No. 220 that "[t]he evidence need not eliminate all possible doubt." Thus, in contrast to the prosecutor in *Katzenberger*, the prosecutor here did not convey an impression of a lesser standard of proof than the

7

constitutionally required standard of proof beyond a reasonable doubt and for that reason there was no misconduct.

## III

### *Unanimity Instruction*

Defendant contends the trial court erred by failing to instruct the jury *sua sponte* that unanimity was required as to what qualified MDMA as an analog of MDA. Defendant is wrong.

As we have noted, "[a]n analog is defined as a substance that:  (1) has a substantially similar chemical structure as the controlled substance, or (2) has, is represented as having, or is intended to have a substantially similar or greater stimulant, depressant, or hallucinogenic effect on the central nervous system as the controlled substance.  (§ 11401, subd. (b)(1) & (2).)"  (*People v. Davis*, *supra*, 57 Cal.4th at p. 358.) Defendant contends the trial court had a duty to instruct the jurors that they had to unanimously agree on the basis on which MDMA was an analog of MDA -- either because MDMA has a substantially similar chemical structure as MDA or because MDMA is represented as having, or is intended to have a substantially similar or greater stimulant, depressant, or hallucinogenic effect on the central nervous system as MDA.

In a criminal case, "the jury must agree unanimously the defendant is guilty of a *specific crime*.  [Citation.]  Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act."  (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)

Here, defendant cites *Russo*, but he ignores what the case says.  The evidence here suggested only one criminal act -- defendant's possession of MDMA, an analog of MDA, for purposes of sale.  The fact that there were two possible theories as to why MDMA qualified as an analog of MDA did not mean there was more than one discrete crime.

8

Accordingly, defendant's argument that a unanimity instruction was required has no merit.

IV

*Evidentiary Error*

Defendant contends the trial court erred in permitting a witness to testify to the meaning of the term "club drug." We find no error.

In the People's case-in-chief, the prosecutor asked Chico Police Officer Marcello Escobedo, who the court had accepted as an expert in the sale or transfer of street drugs, the meaning of the term "club drug." Defense counsel objected on the ground of relevance, but the court overruled the objection. Officer Escobedo answered as follows: "What I learned, club drug is more toward the club scene, the bar scene. In other words, usually the club drug is more used at such things as rapes or somewhere where you want to keep the party going in a sense; where you would take a certain kind of drug in order for you to continue either dancing or staying up to late hours and have the party keep on going, in that sense. Where other drugs are more focused on the -- for example, like Vicodin or prescription medication, where it let's you kind of cool down, just have that relaxed feeling."

Apparently conceding that MDMA qualifies as a "club drug" as Officer Escobedo defined that term, defendant contends "MDMA's usage as a 'club drug' had nothing to do with the allegation that [defendant] possessed MDMA for sale" because "[defendant's] intent to sell was entirely detached from what the potential buyers would do with MDMA." Thus, defendant contends, "[t]he definition of a club drug did not tend to prove intent, or any other fact of consequence; it was irrelevant."

The People first contend defendant forfeited this argument because he did not object to Officer Marcello's answer, only to the prosecutor's question. The People are wrong. By objecting to the prosecutor's question on the ground of relevance, defendant

9

properly preserved the argument that the definition of the term "club drug" was irrelevant, which is the point he pursues on appeal. No further objection was required.

The People next contend that the trial court did not abuse its discretion in allowing Officer Escobedo to define the term "club drug" because the officer's "description and explanation of MDMA as a club drug connected with [defendant]'s claim that, on the night he was stopped, he was going downtown to 'hang out' " and "demonstrated a manner in which [defendant] might be able to sell the drug in a group setting."

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "We review for abuse of discretion a trial court's rulings on relevance . . . ." (*People v. Avila* (2006) 38 Cal.4th 491, 578.)

Here, there was no abuse of discretion because the trial court could have reasonably determined that the meaning of the term "club drug" -- which both parties agree applied to the MDMA that defendant possessed -- had a tendency in reason to prove that defendant possessed the MDMA that was found on him for the purpose of selling it. Defendant's story was that he had purchased the MDMA for personal use and that he did not mean to have bindles in his pocket when the police stopped him. He also admitted, however, that when he left his home with the MDMA in his pocket it was "late at night" on a Friday and he was "going downtown" because he "wanted to get out" and "be like everybody else." Given this evidence, the definition of the term "club drug" had a tendency in reason to prove that defendant was taking the MDMA downtown to sell it to others who were drinking and partying and, in the words of Officer Escobedo, wanted to "have the party keep on going."

Defendant contends that under this theory of relevance, "the relevant question is where MDMA is distributed, not what it is used for." We disagree. Testimony that club drugs like MDMA are used to "have the party keep on going" was relevant to show that defendant intended to sell the drug when he went to downtown Chico *late at night on a*

10

*Friday*.  Accordingly, the trial court did not abuse its discretion in overruling defendant's relevance objection.

DISPOSITION

The judgment is affirmed.

/s/
Robie, J.

We concur:

/s/
Raye, P. J.

/s/
Mauro, J.